## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. TMD-20-612** |
| | * | |
| **ASOMAH MAAMAH** | | |

\*\*\*\*\*\*\*

### MEMORANDUM OPINION[1]

On February 25, 2020, United States Magistrate Judge Thomas M. DiGiralomo issued a criminal complaint charging Asomah Maamah ("Maamah") with a violation of 18 U.S.C. § 2312 (interstate transportation of stolen vehicles).  ECF 1.  Currently pending is the Government's "Appeal of Order Regarding Defendant's Pretrial Release" ("the Motion"), ECF 28, which appeals the release order Judge DiGiralomo entered on May 8, 2020.  ECF 24.  The Court has reviewed the Motion and the relevant responsive briefing, the briefing that had been submitted to Judge DiGiralomo on the issue of detention, the recording of the detention hearing held before Judge DiGiralomo, and Maamah's updated medical records, which this Court ordered to be produced.  *See* ECF 14, 18, 21, 31, 33, 34.  In light of the extensive record, no additional hearing is necessary to resolve this Motion.  *See* Loc. R. 105.6 (D. Md. 2018); *United States v. Martin,* Crim. No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (finding "ample authority for the conclusion that the Court may decide [an appeal of a detention or release order] on the filings . . . as opposed to a hearing.").  For the reasons that follow, the Government's Motion will be denied, and the Court will presently enter a modified release order granting only release to the Pennsylvania detainers, with a federal detainer to be lodged and the propriety of temporary release conditions to be considered once the Pennsylvania detainer is resolved.

---

[1] The Court's previous iteration of this Opinion was filed under seal.  *See* ECF 38.  This Opinion adopts the redactions that the parties jointly provided to the Court.

## I.    FACTUAL BACKGROUND

Upon Maamah's initial appearance in court on March 5, 2020, he consented to detention, reserving his right to request a detention hearing at a later time.  ECF 9.  As will be explored more fully below, during his term of pretrial detention, Maamah tested positive for COVID-19.  After a period of treatment, and seven days of displaying no symptoms, medical staff discharged Maamah from medical isolation on April 29, 2020.  Maamah then sought the detention hearing to which he remained entitled, and the hearing was held on May 8, 2020.  As noted above, Judge DiGiralomo entered an order finding that Maamah did not pose a danger to the community, and that his risk of nonappearance could be mitigated by certain conditions, including placement in the custody of a third party, regular reporting to a pretrial services officer, surrender of any passport or travel documents, location monitoring with 24/7 lockdown, and prohibited use of any computer system or internet-capable device.  ECF 24.  This appeal followed.  ECF 28.

## II.    STANDARD OF REVIEW

Pretrial detention and release are governed by the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141, *et seq.*  The government is permitted to seek pretrial detention of a defendant who poses a serious risk of flight.  *Id.* § 3142(f)(2)(A).  The BRA instructs the Court to seek "the least restrictive further condition or conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  *Id.* § 3142(c)(1)(B).  However, if the Court finds after the hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order the detention of the person before trial."  *Id.* § 3142(e)(1).

The Court's determination is governed by four factors:

(1)    The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1951, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive or destructive device;

(2)    The weight of the evidence against the person;

(3)    The history and characteristics of the person, including –

    (A)    The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B)    Whether, at the time of the current offense or arrest, the person was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.* § 3142(g).

Pursuant to 18 U.S.C. § 3145(a)(1), the attorney for the Government may file a motion for revocation of an order of release issued by a magistrate judge. This Court reviews the magistrate judge's ruling *de novo*, and makes "an independent determination of the proper pretrial detention or conditions of release." *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam); *see also United States v. Clark,* 865 F.2d 1433, 1436 (4th Cir. 1989).

## III.    ANALYSIS

At his detention hearing, Maamah sought release under § 3142(f) and (g). In his briefing on appeal, Maamah alternatively seeks temporary release under § 3142(i). Judge DiGirolamo issued a standard release order in this case, without imposing any temporal limitations, thus indicating that he released Maamah pursuant to § 3142(f). ECF 24. This Court will address each statutory subsection in turn.

At the outset, however, it is important to review the overall framework of the detention issues presented to the Court, and the impact of COVID-19, and the conditions within CTF, on each issue. As described above, when considering whether there are any conditions of pretrial release "that will reasonably assure" a particular defendant's appearance in court, and the safety of the community, 18 U.S.C. § 3142(f), Congress carefully prescribed four factors that a court must consider, *id.* § 3142(g). None of those factors refers specifically to whether the conditions of incarceration threaten the defendant's well-being. Instead, Congress focused the required inquiry on the defendant's risk of nonappearance, and the danger that the defendant's release would pose to other individuals. In some circumstances, clearly, a particular defendant's medical condition could reduce that defendant's risk of flight or danger to the community, and the health condition would therefore fall within the factors appropriately considered in the context of § 3142(g). Absent those circumstances, however, a particular defendant's health conditions, and the possible risks posed to the defendant by incarceration, do not impact the § 3142(f) and (g) analysis. *See, e.g.*, *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) ("A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm *to the defendant* does not usually bear on this analysis."); *United States v. Lawton*, Crim. No. CR419-102, 2020 WL 1984897, at *1 (S.D. Ga. Apr. 27, 2020) (same); *United States v. Whyte*, Crim. No. 3:19-cr-64-1 (VLB), 2020 WL 1911187, at *4 (D. Conn. Apr. 8, 2020) (analyzing medical conditions under § 3142(i)); *United States v. Aguirre-Maldonado*, Crim. No. 20-cr-53 (NEB/TNL), 2020 WL 1809180, at *1 (D. Minn. Apr. 9, 2020) ("While the

Court appreciates the unprecedented nature of the COVID-19 pandemic, Defendant has offered no reason why the pandemic would reduce his risk of nonappearance or the risk that he poses to the community.").

However, as will be discussed below, the COVID-19 pandemic is relevant in the assessment of whether a defendant's temporary release might be appropriate under § 3142(i), and will be considered fully in that context, in accordance with the Fourth Circuit's order in *United States v. Creek*, Criminal No. CCB-19-036, ECF 402 (Apr. 15, 2020) (directing the District Court to consider "in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i).").

### A.    De Novo Assessment of the § 3142(g) Factors

Taking into account the nature of the charges against Maamah, the weight of the evidence, and Maamah's history and characteristics, including his current medical conditions, this Court remains persuaded that Maamah poses a significant risk of nonappearance if released. Under the § 3142(g) standards, then, this Court concludes that no release condition or combination of conditions would reasonably assure Maamah's appearance in court as required, and that his continued detention is warranted.

The analysis begins with the nature and circumstances of the charged offense. The government has proffered that in November, 2018, Customs and Border Protection ("CBP") detected a shipping container containing two stolen/fraudulently purchased vehicles, which had not been declared for export.  ECF 21 at 4-5; ECF 28 at 8-9.  Investigation revealed that

Maamah's Gmail address was linked to the shipment. ECF 21 at 4-5.  In a later interview with investigating agents, Maamah consented to a forensic examination of his iPhone.  *Id.* at 5.  That review revealed numerous images of stolen vehicles loaded inside shipping containers, and other images of vehicles with intentionally obscured license plates, in addition to screenshots relating to shipping containers and related documentation. *Id.*; ECF 28 at 10.  Even at the time of his arrest, Maamah was inside a vehicle that had been fraudulently rented from a rental car company and was overdue for return. ECF 28 at 11.  Maamah made some incriminating admissions to law enforcement after he was Mirandized, including an admission that an associate had told him that vehicles he had previously shipped to Africa were stolen, that the prices he was negotiating for cars were too low, and that the titles for the vehicles in the containers did not match the paperwork provided to the truck driver or the trucking company.  *Id.* On the basis of all of this evidence, Maamah has been charged with transportation of stolen motor vehicles.   While Maamah presents some economic danger to the community, he poses no significant risk of violence.  The weight of the evidence against him, however, is strong.

Turning to Maamah's history and characteristics, his criminal history, while similarly non-violent in nature, highlights the significant risk of nonappearance in this case.   His prior convictions all relate to conduct involving stolen vehicles.  He has a conviction for use of counterfeit plates; for unauthorized use of a motor vehicle; for unlawful taking of a motor vehicle; for receiving stolen property, deceitful business practices, washing vehicle titles, using bad checks, and falsification to authorities using a forged/altered document; and for theft of movable property, theft by deception, and washing vehicle titles.  ECF 28 at 2.  Each of those convictions has occurred between 2014 and 2017.  *Id.*  In that relatively brief time, Maamah has four pending violations of probation, and numerous failures to appear in court.  *Id.* at 6-7.  He

has sixteen failures to appear for traffic related matters. *Id.* at 3. Most recently, Maamah failed to appear in Pennsylvania for a Violation Hearing on June 27, 2019, resulting in the pending arrest warrants. *Id.* at 6. He was on probation at the time of the instant offense. Maamah has no apparent legitimate job history. *Id.* at 13-14; *see* ECF 31 at 9-13 (failing to address Maamah's work history in discussing his particular circumstances).

Moreover, and quite troubling to the Court, law enforcement agents went to Maamah's residence on March 2, 2020, to arrest him. ECF 28 at 10. At the time, Maamah resided with his proposed third party custodian. *Id.* When Maamah was not at home, the agents spoke with the proposed third party custodian, and left a message asking Maamah to contact the agent, because the agent wished to return his iPhone. *Id.* at 10-11. Maamah did not make contact with the agent as requested, and instead, on March 3, 2020, booked a round trip flight for travel to Ghana (departing March 16, 2020, returning March 25, 2020). *Id.* at 11 & n.3. Agents arrested Maamah before he could travel. *Id.* at 11. Although he had purchased a round trip ticket for approximately two weeks later, Maamah has not traveled internationally since 2016. *Id.* at 11 n.3. These facts present significant concerns with respect to the prospect of his nonappearance in court, given Maamah's extensive family connections in Ghana.

As noted below, as part of the history and characteristics of the defendant, this Court has considered Maamah's medical condition, and has reviewed his medical records from the detention facility. Although Maamah now alleges that he suffers from high blood pressure, ECF 31 at 5, at intake, he denied "any acute medical complaint and is not on any medication," and reported no hypertension, *see* Maamah Updated Medical Records at 100.[2] On March 19, 2020,

---

[2] As noted, the Court ordered for the production of an updated version of Maamah's medical records, ECF 33, but those records are not currently on the docket. An outdated version is available, under seal, at ECF 18.

he began complaining of chest pain and asking to go to CTF, where he felt there would be more air in the cells. *Id.* at 92. On March 24, 2020, he complained of shortness of breath, again saying, "I want to be moved to another cell. It is hot in my cell." *Id.* at 89-90. He complained of shortness of breath again on March 30, 2020, and reported to the care provider that "he feels anxious because he is not used to being confined." *Id.* at 89. He saw a mental health provider the following day, who determined that "[a]nxiety is giving feelings of SOB." *Id.* at 87. During that appointment, Maamah stated, "I want to be out of here. Being lockdown is stressful. I shouldn't even be in here." *Id.* at 88. Maamah also made another sick call the same day he saw the mental health provider, on March 31, 2020. *Id.* at 85. His chief complaint was, "I can't stay in the cell." *Id.*

On April 18, 2020, Plaintiff reported to urgent care, believing that his cell mate had COVID-19. *Id.* at 82. Maamah was placed on quarantine and received regular temperature checks. *Id.* at 81-82. On April 21, 2020, Maamah reported to urgent care complaining of headache, fever, chills, and cough. *Id.* at 78. He was tested for COVID. *Id.* at 79. The next day, his test returned positive, but Maamah reported improved symptoms, stating that "he still feels somewhat sick, but nothing specific." *Id.* at 73. Over the ensuing days, Maamah received regular medical care, and reported no significant symptoms. *See, e.g.*, *id.* at 70 ("[P]t reports he is feeling better since taking Tylenol, no current sx" on April 22, 2020); *id.* at 67 ("Pt reports no symptoms at this time. BP remains elevated but can be 2/2 virus. Continue to monitor."); *id.* at 64 ("Asymptomatic, afebrile, doing well, no concerns" on April 25, 2020); *id.* at 59 (noting that Maamah had no fever or chills for three days and was not taking Tylenol anymore on April 26, 2020); *id.* at 54 (a subsequent visit on April 27, 2020, in which Maamah "denie[d] any acute symptoms"). His pretrial services report revealed that Maamah's proposed third party custodian

advised that Maamah was in good physical health, with the exception of chronic leg pain caused by a work accident in 2001.

This Court is not persuaded that Maamah's recent bout with, and recovery from, COVID-19, or the anxiety symptoms he is experiencing in the incarcerative setting, decreases his risk of nonappearance upon release. If anything, this Court is concerned that Maamah's experience in detention, and his repeated representations that he is unable to be confined in a cell, could indicate an enhanced incentive to flee from a possibility of an eventual sentence of imprisonment. Maamah's medical circumstances therefore do not alter this Court's view that, considering the factors in § 3142(g), there is no condition or combination of conditions that can adequately assure his appearance in court Maamah were to be released pending trial.

As will be addressed below, however, some of the circumstances relating to the COVID-19 pandemic do, at least temporarily, reduce Maamah's ability to flee the country. Because those circumstances may change over the coming weeks or months, they are best considered in the context of temporary release.

### B.    Request for Temporary Release Pursuant to § 3142(i)

Section 3142(i) permits "the temporary release of the person, in the custody of a United States marshal or other appropriate person, to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason." Maamah's case, like all criminal cases, has been postponed by this Court's most recent Standing Order canceling all non-emergency court proceedings through June 5, 2020, and the delay occasioned by the pandemic has been excluded under the Speedy Trial Act. *See* Standing Order 2020-07, *In re: Court Operations Under the Exigent Circumstances Created by COVID-19,* Case No. 1:00-mc-00308 (D. Md. April 10, 2020). Thus, at least at this time, temporary

release is not justified on the basis of a need to prepare his defense.  When the Court is able to return to standard operations, Maamah and his attorney will be afforded whatever time is necessary to confer and to prepare an adequate defense. Moreover, on April 23, 2020, Chief Judge James K. Bredar of this Court issued a COVID-19 related order, 20-mc-146, ECF 14, requiring that the DC Department of Corrections forthwith "ensure that Maryland detainees have reasonable access to their counsel and that counsel have reasonable access to their detainee clients, via telephone at least."  Thus, the Sixth Amendment rights of Maryland detainees at CTF will be protected, and there is no need for temporary release to allow for preparation of a defense.

This Court must also assess whether there is "another compelling reason" justifying temporary release under Section 3142(i).  Prior to the instant pandemic, this provision was "sparingly" used to justify temporary release for specific medical treatments, such as cancer surgery or chemotherapy. *See, e.g., United States v. Hamilton*, Crim. No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *3 (E.D.N.Y. March 23, 2020).  Courts have been considering and employing § 3142(i) in a more widespread fashion in the context of COVID-19.  The well-reasoned opinion in *Clark*, 2020 WL 1446895, at *3, sets forth four factors to be considered: (1) The original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent to which the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and, (4) the likelihood that a defendant's release would increase the COVID-19 risks to others.[3]  The Defendant bears the burden of establishing those factors.  *See United States v. Sanders*, Crim. No. 19-20037-01-DDC, 2020 WL 1528621, at *3 (D. Kan. Mar.

---

[3] While *Clark* is not binding, this Court finds its rationale both persuasive and instructive, as have numerous courts around the country, including in this District.  *See, e.g.*, *United States v. Green*, No. 19-cr-00539-CCB, 2020 WL 1873967, at *3 (D. Md. April 15, 2020).

31, 2020).  "The question for the Court is whether the COVID-19 health risks to the Defendant, should he remain detained, outweigh those traditional Section 3142(g) factors and the COVID-19 health risk to the community that Defendant's release could occasion." *United States v. Hernandez*, Crim. No. PX-19-158-9, slip op. at 5-6 (D. Md. Apr. 29, 2020), ECF 385.

While the original grounds for detention weigh in the Government's favor, there are some current, COVID-19 specific impediments to Maamah's ability to flee.  Public movement has been generally and broadly curtailed by stay-at-home orders, although those restrictions are gradually being lifted in some places.  International travel, in particular, is subject to limitations both here and abroad.  As of the date of this opinion, Ghana has closed its international borders, and has prohibited international commercial flights.  U.S. Embassy Accra, Ghana, *Health Alert: Ghana, Border Closure Extended Until May 31*, OVERSEAS SECURITY ADVISORY COUNCIL, https://www.osac.gov/Country/Ghana/Content/Detail/Report/814f97ed-da53-40e9-a934-18947b4a9d01 (last updated May 1, 2020).  That restriction will not expire until at least May 31, 2020. *Id.*

However, Maamah is also subject to at least one no bail, extraditable warrant to Dauphin County, Pennsylvania and to York County, Pennsylvania.[4]  Thus, entry of a release order by this Court will result in Maamah's release to that detainer, and he will likely be held until he is picked up and transported to Pennsylvania to address that warrant.  His personal liberty, then, is likely to be restricted for some additional time, until the outcome of his proceedings in Pennsylvania is known.

---

[4] It appears from the pretrial services report that Maamah sustained separate convictions in the two jurisdictions, but may have been subject to joint probation supervision.  The records before this Court do not make clear whether there is a single warrant pending in both jurisdictions for failure to appear for a Violation Hearing, or whether each County has issued a separate warrant for Maamah's arrest.

The specificity of Maamah's COVID-19 concerns weigh somewhat in favor of his temporary release. Removing Maamah from CTF will lessen any chance of reinfection he may have, and will make social distancing marginally more feasible for the detainees that remain. Maamah's particular posture differs from that of the majority of detainees at CTF, in that he has already been diagnosed with and treated for COVID-19, with apparent success. This Court does not in any way intend to minimize the seriousness of, and the potential for severe complications arising from, an inmate's contracting COVID-19 for a second time. Indeed, no conclusive studies have yet established the extent of any immunity conferred by antibodies to the COVID-19 virus. However, Maamah's infection with, and recovery from, the virus, without experiencing any serious or life-threatening symptoms, undermines his contention that he harbors any particular susceptibility to developing such symptoms, should he contract the virus again.

In addition to the inherent difficulty with maintaining social distancing in an incarcerative setting, Maamah cites extensive information about the general conditions at his detention facility. A significant number of detainees at CTF and the connected D.C. jail (collectively "CTF"), have tested positive for COVID-19. Although the vast majority have recovered, one detainee has died. *Public Safety Agency COVID-19 Case Data*, Gov't of D.C. (May 14, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data. A class action lawsuit on behalf of persons incarcerated at CTF was filed in the United States District Court for the District of Columbia. *See Banks v. Booth*, No. 20-849-CKK (D.D.C. Apr. 19, 2020). The lawsuit sought immediate release or transfer of those detained, contending that CTF's inadequate response to the COVID-19 pandemic violates the detainees' constitutional rights. The presiding United States District Judge, Colleen Kollar-Kotelly, appointed independent inspectors to

provide a comprehensive report and recommendations describing detailing the conditions inside CTF, with respect to the safety of those incarcerated.  *Id.*, ECF 47.  Upon review of the inspectors' report, Judge Kollar-Kotelly issued a Temporary Restraining Order, requiring certain specific corrective action aimed at immediately improving the conditions of confinement at CTF.  *Id.*, ECF 48.  Even as of the date of the inspectors' report and recommendations, D.C.'s Department of Corrections ("DOC") had already taken steps towards implementing some of the reforms, as expressed in a memorandum attached to the inspectors' report.

Significantly, despite the findings in the inspectors' report, Judge Kollar-Kotelly did not order the release or transfer of any detainees or inmates, or any reduction in the overall population at CTF.  *Id.*, ECF 49 at 26 ("The Court is not ordering the release of any inmates currently detained in DOC facilities.").  Judge Kollar-Kotelly's continued monitoring of the litigation, as it moves from the posture of a temporary restraining order to one considering the propriety of any further injunctive or other relief, might result in the imposition of further corrective measures.  Additional steps she takes will likely depend on the DOC's compliance with the improvements she has ordered to date.  Clearly, however, Judge Kollar-Kotelly and her team of experts and inspectors are in the best position to evaluate the overall conditions at the facility, and to monitor the protection of the constitutional rights of its detainees, including putative class members such as Maamah.  "Although the pendency of that action does not impede this Court from assessing Defendant's motion under the Bail Reform Act (which, necessarily, requires an individual assessment of Defendant's detention situation), some recognition of principles of comity is appropriate to promote the twin goals of avoiding "an unnecessary burden on the federal judiciary" and preventing 'the embarrassment of conflicting judgment.'"  *United States v. Hernandez*, Crim. No. 19-00158-PX, ECF 385 at 5 (Coulson, J.)

(quoting *In re Naranjo*, 768 F.3d 332, 348 (4th Cir. 2014) and *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979)).  Thus, it would be inappropriate for this Court to consider the situation at CTF more broadly, other than in the context of the simple application of the Bail Reform Act to Maamah.

Ultimately, as to the second *Clark* factor, the Court is not persuaded that Maamah is presently at a particularly increased risk of serious complications from the COVID-19 virus, by virtue of his continued detention at CTF, as compared with those "high risk" individuals with certain underlying health conditions.  In fact, his initial experience with the virus counsels against such a finding.  Nonetheless, removal of Maamah from the CTF facility, if adequate temporary conditions of release can be fashioned, will protect him from the risk of reinfection, if such reinfection is possible, and will bolster the facility's ability to accommodate social distancing among its remaining detainees.

The final two *Clark* factors involve the nature of the proposed release plan, including the extent to which it is designed to mitigate Maamah's exposure to the COVID-19 virus, and the risk that Maamah's release would pose to the community.

The Court is persuaded that Maamah's risk of a second exposure to the virus could be mitigated by his eventual release plan.  His proposed third party custodian works as a nurse's assistant and would be well-prepared to care for Maamah, and to take the required precautions to protect the custodian, and the custodian's family, from exposure.  ECF 31 at 13-14.  The proposed residence has adequate space to allow Maamah to quarantine in a private room and bathroom.  *Id.* at 14.  Thus, the COVID-related aspects of the release plan are sound.

In conclusion, most of the *Clark* factors weigh in favor of Maamah's temporary release. He poses no significant danger to the community, and the flight risk concerns motivating this

Court's detention decision are ameliorated by present circumstances and restrictions resulting from the COVID-19 pandemic. While Maamah's personal COVID-19 concerns are somewhat tempered by his infection and recovery, his risk of reinfection cannot be ruled out, and his temporary removal from CTF would be of some benefit to the remaining detainees. Finally, Maamah's temporary release to the home of his proposed third party custodian would not pose a significant danger to any party's health, given the custodian's experience as a nurse's assistant and the ability to afford Maamah a room and bathroom within the custodian's home in which he can quarantine. Taking all of these factors collectively, under present circumstances, Maamah has met his burden to establish a compelling reason justifying his temporary release from pretrial detention, pursuant to 18 U.S.C. § 3142(i).

However, initially, the Court wishes to ensure that there will not be a period in which Maamah is unsupervised, should Pennsylvanian authorities release Maamah from the outstanding detainer before monitoring can be effected in Maryland. Accordingly, at this point, this Court is ordering only the release of Maamah to the Pennsylvania detainer. Simultaneously, the United States Attorney's Office should lodge a detainer requiring Maamah's return to federal custody in Maryland upon his release from Pennsylvania. If Pennsylvanian authorities decide that they will not execute their warrant, the parties should promptly notify this Court, and the then-existing circumstances will be reevaluated to determine whether temporary release to the proposed third party custodian under § 3142(i) remains appropriate. Similarly, if Maamah is taken into Pennsylvania custody, but then released back to the federal detainer, this Court should receive immediate notification so that a temporary release order can be considered. Ultimately, any temporary release will be subject to frequent review, given the constantly changing nature of the relevant pandemic-related restrictions.

## IV.    CONCLUSION

For the reasons set forth above, the Government's Motion for Review of Release Order, ECF 28, is DENIED.    An accompanying Order, requiring the release of Maamah to the Pennsylvania detainer, pursuant to 18 U.S.C. § 3142(i), follows.

Dated:  May 22, 2020                              _____/s/_____
                                                              Stephanie A. Gallagher
                                                              United States District Judge